RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0204p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

OHIO DEMOCRATIC PARTY; DEMOCRATIC PARTY OF CUYAHOGA COUNTY; MONTGOMERY COUNTY DEMOCRATIC PARTY; JORDAN ISERN; CAROL BIEHLE; BRUCE BUTCHER,

> *Plaintiffs-Appellees,*

*v.*

JON HUSTED, in his official capacity as Secretary of State of the State of Ohio; MIKE DEWINE, in his official capacity as Attorney General of the State of Ohio,

> *Defendants-Appellants.*

No. 16-3561

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:15-cv-01802—Michael H. Watson, District Judge.

Argued: August 2, 2016

Decided and Filed: August 23, 2016

Before: McKEAGUE, GRIFFIN, and STRANCH, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Eric E. Murphy, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellants. Marc E. Elias, PERKINS COIE LLP, Washington, D.C., for Appellees. **ON BRIEF:** Eric E. Murphy, Michael J. Hendershot, Stephen P. Carney, Steven T. Voigt, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellants. Marc E. Elias, Bruce V. Spiva, Elisabeth C. Frost, Rhett P. Martin, Amanda R. Callais, PERKINS COIE LLP, Washington, D.C., Joshua L. Kaul, PERKINS COIE LLP, Madison, Wisconsin, Donald J. McTigue, J. Corey Colombo, Derek S. Clinger, MCTIGUE & COLOMBO LLC, Columbus, Ohio, for Appellees. Chad A. Readler, JONES DAY, Columbus, Ohio, Michael A. Carvin, Anthony J. Dick, Stephen A. Vaden, JONES DAY, Washington, D.C., Thomas M. Fisher,

OFFICE OF THE INDIANA ATTORNEY GENERAL, Indianapolis, Indiana, Joseph A. Vanderhulst, PUBLIC INTEREST LEGAL FOUNDATION, Plainfield, Indiana, Linda Carver Whitlow Knight, GULLETT SANFORD ROBINSON & MARTIN PLLC, Nashville, Tennessee, Paul J. Orfanedes, JUDICIAL WATCH, INC. Washington, D.C., Elizabeth B. Wydra, CONSTITUTIONAL ACCOUNTABILITY CENTER, Washington, D.C., for Amici Curiae.

McKEAGUE, J.; delivered the opinion of the court in which GRIFFIN, J., joined. STRANCH, J. (pp. 28–43), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

McKEAGUE, Circuit Judge.   This case presents yet another appeal (there are several pending in the Sixth Circuit alone) asking the federal courts to become entangled, as overseers and micromanagers, in the minutiae of state election processes.   No one denies that our Constitution, in defining the relationship between the people and the government, establishes certain fundamental rights—including the right to vote—that warrant vigilant enforcement.   But our Constitution also defines the relationship between spheres of government, state and federal, and their responsibilities for protecting the rights of the people.   The genius of this balance of power is no less deserving of vigilant respect.

Ohio is a national leader when it comes to early voting opportunities.   The state election regulation at issue allows early in-person voting for 29 days before Election Day.   This is really quite generous. The law is facially neutral; it offers early voting to everyone.   The Constitution does not require *any* opportunities for early voting and as many as thirteen states offer just one day for voting:  Election Day.   Moreover, the subject regulation is the product of a bipartisan recommendation, as amended pursuant to a subsequent litigation settlement.   It is the product of collaborative processes, not unilateral overreaching by the political party that happened to be in power.   Yet, plaintiffs complain that allowance of 29 days of early voting does not suffice under federal law.   They insist that Ohio's prior accommodation—35 days of early voting, which also created a six-day "Golden Week" opportunity for same-day registration and voting—established a federal floor that Ohio may add to but never subtract from.   This is an astonishing proposition.

Nearly a third of the states offer no early voting. Adopting plaintiffs' theory of disenfranchisement would create a "one-way ratchet" that would discourage states from ever increasing early voting opportunities, lest they be prohibited by federal courts from later modifying their election procedures in response to changing circumstances. Further, while the challenged regulation may slightly diminish the convenience of registration and voting, it applies even-handedly to all voters, and, despite the change, Ohio continues to provide generous, reasonable, and accessible voting options to all Ohioans. The issue is not whether some voter somewhere would benefit from six additional days of early voting or from the opportunity to register and vote at the same time. Rather, the issue is whether the challenged law results in a cognizable injury under the Constitution or the Voting Rights Act. We conclude that it does not.

Federal judicial remedies, of course, are necessary where a state law impermissibly infringes the fundamental right to vote. No such infringement having been shown in this case, judicial restraint is in order. Proper deference to state legislative authority requires that Ohio's election process be allowed to proceed unhindered by the federal courts. Accordingly, and for the reasons more fully set forth below, we REVERSE the decision of the district court insofar as it declared the subject regulation invalid and enjoined its implementation.

## I.  BACKGROUND

### A.  Procedural History

This is an appeal by State of Ohio officials from a district court judgment declaring a state election regulation invalid as violative of equal protection and Section 2 of the Voting Rights Act of 1965. The law, known as Senate Bill 238, amends Ohio Revised Code § 3509.01 to allow early in-person voting for a period of 29 days before Election Day. Though the law is facially neutral, the district court held that it results in an impermissible disparate burden on some African-American voters. Following a ten-day bench trial in November and December 2015, the district court issued its 120-page ruling on May 24, 2016, in the form of findings of fact and conclusions of law. The court enjoined enforcement of S.B. 238, thereby effectively restoring Ohio's preexisting 35-day early in-person voting period. Ohio officials promptly moved for a stay, arguing that implementing the district court's order ahead of a special election

on August 2, 2016, and the general election on November 8, 2016, would cause irreparable harm to its boards of elections and voting public. The court granted Ohio's motion in part, staying its order only with respect to the special election that has since taken place on August 2. Ohio officials did not appeal the court's ruling on the motion to stay, but asked us to expedite the merits appeal so the matter may be resolved prior to the November general election, a motion we granted.

## B. Voting in Ohio

A brief review of recent voting regulation history in Ohio provides context. In 2004, Ohio permitted absentee ballots only if registered voters asserted one of several "excuses." *See* Ohio Rev. Code § 3509.02(A)(1)–(8) (2004). The timeline for voting by absentee ballot was generous: a voter could pick up a ballot 35 days before Election Day, the first five of which extended into Ohio's voter registration period (which ended 30 days before an election). Thus, Ohio maintained a five-day overlap of its registration period and its absentee voting period, allowing residents armed with a proper excuse to both register and vote (absentee) on the same day. This "same-day registration" window became known in Ohio as "Golden Week." R. 117, Opinion at 34, Page ID 6156.

The 2004 presidential election brought special challenges to Ohio's general voting apparatus. Among other problems, Ohio voters "faced long lines and wait-times that, at some polling places, stretched into the early morning of the following day." *Obama for America v. Husted*, 697 F.3d 423, 426 (6th Cir. 2012). Largely in response to this experience, Ohio refined its absentee voting system in 2005 to permit early voting without need of an excuse. *Id.* Ohio residents enjoying the freedom of this "no-fault" or "no-excuse" system could vote absentee by mail or in person ("early in-person" or "EIP" voting) at their convenience. Ohio retained its pre-existing absentee voting time frame.

Until 2012, each of Ohio's 88 county boards of elections retained the discretion to implement its own schedule for early in-person absentee voting. Varying schedules resulted. To remedy the inconsistencies, a task force from the Ohio Association of Election Officials (OAEO), a bipartisan association of election officials, proposed adoption of a uniform 21-day

early in-person voting schedule, under which the period for "early" or "absentee" voting would start nine days *after* the end of the voter registration period.

In 2012, Ohio passed a law based on the OAEO recommendation, but repealed it after the law became subject to a referendum. In 2013, another bipartisan task force recommended that absentee voting not be allowed until the day after the registration period closed, establishing an early voting time frame of 29 days instead of the previously recommended 21 days. On February 19, 2014, Ohio passed S.B. 238, amending Ohio Rev. Code § 3509.01 to make the first day of early absentee voting—whether early in-person or by mail—the day after the close of voter registration. This amendment effectively eliminated Golden Week and the possibility of same-day registration.

Shortly before the 2014 election, the NAACP and other groups challenged S.B. 238, alleging that it disproportionally affected African Americans, thereby (1) violating the Equal Protection Clause of the Fourteenth Amendment by burdening African Americans' fundamental right to vote; and (2) violating Section 2 of the Voting Rights Act of 1965 by burdening African-American voters' ability to participate effectively in Ohio's political process. Though a panel of this court upheld a preliminary injunction preventing implementation of the law, *see Ohio State Conference of NAACP v. Husted*, 768 F.3d 524, 529 (6th Cir. 2014) (hereinafter "*NAACP*"), the Supreme Court stayed the injunction, *Husted v. Ohio State Conference of NAACP*, 135 S. Ct. 42 (2014), and the panel subsequently vacated its decision for mootness. *Ohio State Conference of NAACP v. Husted*, 2014 WL 10384647, at *1 (6th Cir. Oct. 1, 2014). Thus, the 2014 election took place with S.B. 238 in full effect. After the election, the parties to *NAACP* reached a settlement under which Ohio added another Sunday of early in-person voting as well as additional evening hours, and the plaintiffs voluntarily dismissed their claim challenging the 29-day voting period.[1]

This brings us to the present action. After *NAACP* settled, plaintiffs in this action, the Ohio Democratic Party, the Democratic Party of Cuyahoga County, the Montgomery County Democratic Party, and three individuals (collectively referred to as "plaintiffs" or the

---

[1]Plaintiffs in the case before us were not parties to the settlement.

"Democratic Parties"), evidently finding the settlement negotiated by the NAACP to be unsatisfactory, challenged S.B. 238 (as modified per settlement) and other Ohio laws as violating the Equal Protection Clause and Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.[2] Despite subsequently acknowledging that "Ohio's national leadership in voting opportunities is to be commended," R. 125, Stay Order, Page ID 6302, the district court held that S.B. 238 violated the Equal Protection Clause and the Voting Rights Act based largely on what it called the "highly persuasive" reasoning of this court's since-vacated ruling upholding a preliminary injunction in *NAACP*. *See* R. 117, Opinion at 35–36, Page ID 6156–57.

Regarding plaintiffs' equal protection challenge, the district court concluded that S.B. 238 imposed a "modest" (i.e., "more than minimal but less than significant") disparate burden on African Americans. The "numerous opportunities to cast a ballot in Ohio, including vot[ing] by mail, in person on Election Day, and on other EIP voting days" were deemed insufficient to mitigate the burden. *See* R. 117, Opinion at 34–36, 42–43, Page ID 6156–58, 6164–65. Although Ohio allows numerous and convenient registration options (including registration by mail), more than four weeks of absentee voting, and more than three weeks of early in-person voting, the district court acknowledged that there are minimal postage costs associated with voting by mail and accepted what it characterized as "anecdotal evidence" that "African Americans are distrustful of voting by mail" to conclude that voting by mail may not be a suitable alternative to early in-person voting for many African-Americans. *Id*. at 43–44, Page ID 6165–66. The court concluded that, despite Ohio's generous voting options, S.B. 238's modification of Ohio's early voting schedule resulted in a disparate burden on some African-American voters. And despite accepting the legitimacy of Ohio's asserted interests (preventing fraud, decreasing costs, reducing administrative burdens, and enhancing voter confidence, *id*. at

---

[2]The Democratic Parties also challenged Ohio statutes: (1) establishing one early in-person voting location per county; (2) altering the number of voting machines per county; (3) revamping the requirements for unsolicited absentee-ballot mailing applications; and (4) regarding the state's absentee and provisional ballot requirements. R. 117, Opinion at 2, Page ID 6124. The district court rejected all of these claims, and plaintiffs did not cross-appeal. However, in a display of incongruity between district court judges *in the same district*, a separate district court in the Southern District of Ohio, fully aware of the district court's ruling in this case, found Ohio's very same absentee-ballot and provisional-ballot laws to constitute a "significant burden" not justified by the State's interests. *Ne. Ohio Coal. for the Homeless v. Husted*, No. 2:06-CV-896, 2016 WL 3166251, at *36 (S.D. Ohio June 7, 2016). The court declared both laws violative of the Equal Protection Clause and Section 2 of the Voting Rights Act. Ohio's appeal of that decision is currently pending before a different panel of this court.

49–57, Page ID 6171–79), the court held they did not justify the modest burdens imposed by the law.

The court then turned to the Democratic Parties' Voting Rights Act claim and held that S.B. 238 violated Section 2 of the Voting Rights Act as it "interacts with the historical and social conditions facing African Americans in Ohio to reduce their opportunity to participate in Ohio's political process relative to other groups of voters[.]" *Id.* at 107, Page ID 6229.

## II. EQUAL PROTECTION

### A. Framework

Election cases rest at the intersection of two competing interests. Though not a delineated right per se, the Supreme Court has readily acknowledged the general right to vote as "'implicit in our constitutional system.'" *Mixon v. State of Ohio*, 193 F.3d 389, 402 (6th Cir. 1999) (quoting *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 35 n.78, (1973)). As such, this "precious" and "fundamental" right is afforded special protection by the courts, *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 670 (1966), as "voting is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (citation omitted). Against this backdrop, however, we also acknowledge the obvious: the "right to vote in any manner . . . [is not] absolute," *id.*, as the Constitution recognizes the states' clear prerogative to prescribe the "Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. Art. I, § 4, cl. 1. "Common sense, as well as constitutional law, compels the conclusion that [there] . . . must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Burdick*, 504 U.S. at 433 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). Federal law thus generally defers to the states' authority to regulate the right to vote. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 203–04 (2008) (Stevens, J., op.) (recognizing that neutral, nondiscriminatory regulation will not be lightly struck down, despite partisan motivations in some lawmakers, so as to avoid frustrating the intent of the people's elected representatives).

When a constitutional challenge to an election regulation calls us to resolve a dispute concerning these competing interests, we apply the so-called *Anderson-Burdick* framework, an analysis arising from the Supreme Court's holdings in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). The *Anderson-Burdick* framework involves the following considerations:

> [T]he court must first consider the character and magnitude of the asserted injury to the rights protected by the [Constitution] that the plaintiff seeks to vindicate. Second, it must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. Finally, it must determine the legitimacy and strength of each of those interests and consider the extent to which those interests make it necessary to burden the plaintiff's rights.

*Green Party of Tennessee v. Hargett*, 791 F.3d 684, 693 (6th Cir. 2015) (internal quotation marks and citations omitted). Though the touchstone of *Anderson-Burdick* is its flexibility in weighing competing interests, the "rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434. This flexible balancing approach is not totally devoid of guidelines. If a state imposes "severe restrictions" on a plaintiff's constitutional rights (here, the right to vote), its regulations survive only if "narrowly drawn to advance a state interest of compelling importance." *Id*. On the other hand, "minimally burdensome and nondiscriminatory" regulations are subject to a "less-searching examination closer to rational basis" and "'the State's important regulatory interests are generally sufficient to justify the restrictions.'" *Ohio Council 8 Am. Fed'n of State v. Husted*, 814 F.3d 329, 335 (6th Cir. 2016) (citing *Hargett*, 767 F.3d at 546, and quoting *Burdick*, 504 U.S. at 434). Regulations falling somewhere in between—i.e., regulations that impose a more-than-minimal but less-than-severe burden—require a "flexible" analysis, "weighing the burden on the plaintiffs against the state's asserted interest and chosen means of pursuing it." *Hargett*, 767 F.3d at 546.

Because plaintiffs have advanced a broad attack on the constitutionality of S.B. 238, "seeking relief that would invalidate the statute in all its applications, they bear a heavy burden of persuasion." *Crawford*, 553 U.S. at 200 (Stevens, J., op.). Because we conclude that S.B. 238 results, at most, in a minimal disparate burden on some African Americans' right to vote, and

because the State's legitimate interests are "sufficiently weighty" to justify this minimal burden, S.B. 238 easily survives plaintiffs' equal protection challenge. *See id.* at 190.

### B. Disparate Burden on African-American Voters

#### 1. District Court's Characterization

The first step in evaluating the plaintiffs' equal protection challenge requires us to identify the "character and magnitude" of the burden on African-American voters as a result of the challenged law. The district court identified the burden imposed on some African Americans' right to vote by considering the *changes* effected by S.B. 238, rather than by examining Ohio's election regime as a whole. The court found that operation of S.B. 238 resulted in a disparate burden on some African Americans as a function of two changes: "(1) by reducing the overall [early in-person] voting period, and (2) by eliminating the opportunity for [same-day registration]." R. 117, Opinion at 35, Page ID 6157.

Regarding the reduction of the early in-person voting period, the district court discerned a burden after accepting three simple premises: (1) that tens of thousands of people voted during Golden Week in both 2008 and 2012 and are likely to do so in the upcoming 2016 election; (2) that S.B. 238's elimination of Golden Week requires that "[i]ndividuals who would have voted during Golden Week in future elections must now vote on other days during the early voting period, vote absentee by mail, vote on Election Day, or not vote at all;" and (3) because African Americans have shown a preference for voting early in person (and during Golden Week) at a rate higher than other voters, the "elimination of the extra days for EIP voting provided by Golden Week will disproportionately burden African Americans." *Id.* at 36, Page ID 6158. The district court further noted that beginning early in-person voting after the registration period eliminated "same-day registration," meaning that "voters must now register and vote at separate times, which increases the 'cost of voting,' especially for socio-economically disadvantaged groups." *Id.* at 40, Page ID 6162. That is, the court recognized that "it may be more difficult for voters with time, resource, transportation, and childcare restraints to make two separate trips to register and vote, and Golden Week allowed individuals to do both at once." *Id.* The district court concluded that, because "African Americans in particular are more

likely to be subject to economic, transportation, time, and childcare constraints," *id.* at 40, Page ID 6162, they "disproportionately make up the group that benefits the most from [same-day registration], and the elimination of that opportunity burdens their right to vote." *Id.* at 42, Page ID 6164. Taking the reduction in early in-person voting days and the elimination of same-day registration together, the district court characterized the changes effected by S.B. 238 as imposing a "modest" burden on African Americans' right to vote. *Id.*

### 2. Defining the Burden

As a threshold matter, we note that the district court's characterization of the resultant burden as "modest" is not a factual finding, but a legal determination subject to de novo review. *See Bright v. Gallia Cnty.*, 753 F.3d 639, 652 (6th Cir. 2014) (explaining that "legal conclusions masquerading as factual allegations" do not convert legal questions into factual ones); *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 587 (6th Cir. 2006) (evaluating factual and evidentiary factors to reach a legal conclusion on the "magnitude" of burden); *Hargett*, 767 F.3d at 547 ("Whether a voting regulation imposes a severe burden is a question with both legal and factual dimensions."); *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (en banc) (applying de novo review to mixed questions of law and fact, observing that "findings of ultimate fact based on the application of legal principles to subsidiary facts are subject to de novo review."). Inasmuch as the State does not challenge the district court's findings of fact, we evaluate de novo the district court's application of legal principles to those subsidiary facts in characterizing the burden made out by those facts.

The undisputed factual record shows that it's easy to vote in Ohio. Very easy, actually. Viewing S.B. 238 as one component of Ohio's progressive voting system, and considering the many options that remain available to Ohio voters, even accepting the district court's focus on the *changes* wrought by S.B. 238, the removal of Golden Week can hardly be deemed to impose a true "burden" on any person's right to vote. At worst, it represents a withdrawal or contraction of just one of many conveniences that have generously facilitated voting participation in Ohio. This is especially apparent when Ohio's voting practices are compared to those of other states.

Ohio's early voting system, as amended by S.B. 238, is one of the more generous in the nation. The State's 29-day early voting period is currently the tenth-longest among all the states. R. 127-14, Trende Rep. at 10, Page ID 6610. When compared to the thirteen states (including two other states in our circuit, Kentucky and Michigan) that do not permit *any* early in-person voting days, an Ohioan's path to voting is open and easy, *not* burdensome. And S.B. 238's withdrawal of the convenience of same-day registration is hardly obstructive; it merely brings Ohio into line with thirty-eight other states that require registration *before* an individual may vote.[3] Ironically, if Ohio had never expanded access to absentee ballots in the first place and maintained early voting systems similar to Michigan's or Kentucky's (permitting no early in-person voting), it would have avoided this challenge altogether, as well as those addressed in *Obama for America*, 697 F.3d 423, and our since-vacated preliminary injunction decision in *NAACP*, 768 F.3d 524. Instead, "it is [Ohio's] willingness to go further than many States in extending the absentee voting privileges . . . that has provided [plaintiffs] with a basis for arguing that the provisions operate in an invidiously discriminatory fashion to deny them a *more convenient* method of exercising the franchise." *McDonald*, 394 U.S. at 810–11 (emphasis added). It's as if plaintiffs disregard the Constitution's clear mandate that the states (and not the courts) establish election protocols, instead reading the document to require all states to maximize voting convenience. Under this conception of the federal courts' role, little stretch of imagination is needed to fast-forward and envision a regime of judicially-mandated voting by text message or Tweet (assuming of course, that cell phones and Twitter handles are not disparately possessed by identifiable segments of the voting population).

The district court ignored Ohio's national leadership in affording privileged voting opportunities, believing that comparison of Ohio's early-voting system to that of other states was irrelevant under *Anderson-Burdick*. We fail to see the merit in wearing blinders. While comparisons with the laws and experience of other states may not be determinative of a challenged law's constitutionality, to ignore such information as irrelevant is to needlessly forfeit a potentially valuable tool in construing and applying "equal protection of the laws," a constitutional standard applicable to *all* the states. Forfeiting such a tool would artificially

---

[3]*See Same Day Voter Registration*, National Conference of State Legislatures (May 25, 2016), http://www.ncsl.org/research/elections-and-campaigns/same-day-registration.aspx.

constrict the court's vision and deny reality:  courts routinely examine the burden resulting from a state's regulation with the experience of its neighboring states.  *See Blackwell*, 462 F.3d at 589 (comparing Ohio's process for permitting minor political parties to gain access to the general election ballot with numerous other states); *Hargett*, 791 F.3d at 694–95 (comparing Tennessee's "access-retention" system broadly to other states); *Frank v. Walker*, 768 F.3d 744, 745 (7th Cir. 2014) (comparing Wisconsin's voter-ID statute to Indiana's).

We certainly recognize that different states may offer different justifications for the existence or absence of early in-person voting or same-day registration, and do not suggest that Ohio may escape challenges to election regulations simply by pointing to the least accommodating state and saying, "We do it better."  Rather, we reject the notion that such comparisons are irrelevant, as they provide a contextual basis for determining whether the "burden" said to fall here disproportionately on some African-American voters is properly characterized as non-existent, or minimal, or slight, or limited, or modest, or significant, or enormous, or severe.  And besides, Ohio is not simply arguing its practices are better.  Instead, State officials are defending a liberal absentee voting practice that *facilitates* participation by all members of the voting public, including those in "socioeconomically disadvantaged groups," *see* R. 117, Opinion at 40, Page ID 6162, of whatever race or ethnic background, in a manner more accommodating than the practices of most other states, by affording a "no-questions-asked" right to an absentee ballot and a litany of ways to use it.

Thus, in evaluating the magnitude of the "burden," we find that elimination of Golden Week is a small part of what remains, objectively viewed, a generous early voting schedule.  The notion that S.B. 238's elimination of same day registration disparately imposes anything more than a "minimal" burden on some African Americans ignores the abundant and convenient alternatives that remain for all Ohioans who wish to vote.

Consider the numerous options available to all Ohio voters, including African Americans, to conveniently cast a ballot before Election Day.  The State's use of "no-excuse" absentee ballots provides any interested resident the chance to cast a ballot more than *four weeks* before Election Day by mail, and more than *three weeks* before Election Day if a voter prefers to do so in person.  Ohio Rev. Code § 3509.01.  Moreover, this early in-person voting schedule includes

two Saturdays, two Sundays, and ten days when voting is permitted until either 6:00 p.m. or 7:00 p.m.—for voters who are "distrustful of voting by mail," R. 117, Opinion at 43, Page ID 6165, who are assisted by "Souls to the Polls" initiatives, Page ID 6168, who struggle to find time away from "hourly wage jobs," Page ID 6162, or who merely prefer to save on postage. And these accommodations are a *direct result* of the settlement reached in *NAACP* which was specifically designed to accommodate voters in Ohio's African-American communities. *See* R. 127-14, Settlement, Page ID 6775–77.

The district court placed inordinate weight on its finding that some African-American voters *may prefer* voting on Sundays, or avoiding the mail, or saving on postage, or voting after a nine-to-five work day. To the extent S.B. 238 may be viewed as impacting such preferences, its "burden" clearly results more from a "matter of choice rather than a state-created obstacle." *Frank*, 768 F.3d at 749. The Equal Protection Clause, as applied under the *Anderson-Burdick* framework, simply cannot be reasonably understood as demanding recognition and accommodation of such variable personal preferences, even if the preferences are shown to be shared in higher numbers by members of certain identifiable segments of the voting public.

We also conclude that the elimination of same-day registration and the resulting need for Ohioans to register and vote on separate occasions is, at most, minimally burdensome. Like voting before Election Day, Ohio also makes registration easy. Registration forms are conveniently distributed throughout its communities at the 88 boards of elections offices as well as many other locations, including "local libraries, at many of the municipal city halls, high schools"—and can even be printed from county websites. R. 97, Perlatti Tr., Page ID 4067.[4] And if this isn't enough, the Secretary of State mailed absentee ballot applications to almost every registered voter in the state in the past two elections and plans to do so in the 2016 election. *Id.* Thus, even without Golden Week, Ohio's registration and voting processes afford abundant opportunity for all Ohio voters, of whatever racial or ethnic background, to register and exercise their right to vote.

---

[4]Ohio has also recently passed a law permitting voters to register online, so long as they verify their social security number and input their driver's license number or identification card number to establish proof of identity. *See* S.B. 63 (2016) (effective 9/13/2016).

It's no surprise then, that the Supreme Court in *Crawford* rejected an analogous challenge to an undeniably more burdensome law based on this sort of "burden of making a second trip to vote" argument. The Court held that first going to the Bureau of Motor Vehicles *and then* casting a ballot was ultimately no more "burdensome" than the usual challenges of voting. *Crawford*, 553 U.S. at 198–99 (Stevens, J., op.) (the "inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph surely does not . . . even represent a significant increase over the usual burdens of voting," *even though* "a somewhat heavier burden may be placed on a limited number of persons" including the elderly, the economically disadvantaged, and the homeless). Scrounging up a birth certificate, making a trip to the BMV, and obtaining a photo ID surely cannot be considered less "burdensome" than submitting one of Ohio's virtually ubiquitous registration cards (which can be mailed back, dropped off in person, or returned by another) and enjoying the convenience of a no-excuse early absentee voting on any one of Ohio's *twenty-nine* voting days.

Therefore, viewing S.B. 238 objectively under the *Anderson-Burdick* framework in a manner consonant with the Court's most recent application of the framework in *Crawford*, we see a regulation that can only be characterized as minimally burdensome on the right of some African-American voters. Beyond evidence that African Americans may use early in-person voting at higher rates than other voters and may therefore be theoretically disadvantaged by reduction of the early voting period, the record does not establish that S.B. 238—as opposed to non-state-created circumstances—*actually makes voting harder* for African Americans. Plaintiffs do not point to any individual who, post-S.B. 238, will be precluded from voting. Without sufficient evidence to "quantify either the magnitude of the burden on this narrow class of voters or the portion of the burden that is fully justified," the *Crawford* Court refused to accept bare assertions that "a small number of voters . . . may experience a special burden" and instead looked to the statute's "broad application" to all state voters in concluding that the law imposed "only a limited burden on voters' rights." *Crawford*, 553 U.S. at 200, 202–03 (Stevens, J., op.).

The *Crawford* application of *Anderson-Burdick* is consistent with our precedent recognizing that broadly applicable and non-discriminatory laws are presumed to pass constitutional muster: "If the State had enacted a generally applicable, nondiscriminatory voting

regulation that limited in-person early voting for all Ohio voters, its 'important regulatory interests' would likely be sufficient to justify the restriction." *Obama for America*, 697 F.3d at 433–34 (quoting *Burdick*, 504 U.S. at 434);[5] *see also Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 452 (2008) ("If a statute imposes only *modest* burdens, however, then the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions on election procedures." (internal quotation marks omitted; emphasis added)). The *Crawford* Court also recognized, in fact, that it had "applied *Anderson*'s standard for reasonable, nondiscriminatory restrictions and upheld Hawaii's prohibition on write-in voting even though it actually *prevented* a significant number of voters from participating in Hawaii elections in a meaningful manner." *Crawford*, 553 U.S. at 190 (Stevens, J., op.) (internal citation and quotation marks omitted; emphasis added).

Considering the generally applicable and non-discriminatory nature of S.B. 238 in light of Ohio's generous absentee voting system, a system which provides extensive opportunities for all voters, including African Americans, to cast their ballots short of coming out on Election Day, we hold that S.B. 238 results only in a minimal burden on African Americans' right to vote. *See Burdick*, 504 U.S. at 434–37 (assessing Hawaii's ban on "write-in" votes for candidates in light of the State's otherwise "easy access to the ballot"); *Ohio Council*, 814 F.3d at 335 (holding that ballot restrictions on judicial candidates imposed only minimal burdens on political parties because Ohio law gave parties "many other opportunities to champion [their] nominee[s]"). We therefore reject the district court's conclusion that S.B. 238 imposes a "modest" burden. We next look to the State's interests in adopting the regulation. *See Crawford*, 553 U.S. at 190 (Stevens, J., op.).

## C. State's Interests

Because S.B. 238 is minimally burdensome and nondiscriminatory, we apply a deferential standard of review akin to rational basis and Ohio need only advance "important regulatory interests" to satisfy the *Anderson-Burdick* analysis. *See Burdick*, 504 U.S. at 434; *Ohio Council*, 814 F.3d at 338 (plaintiffs bear a "heavy constitutional burden" to demonstrate

---

[5]*Obama for America*, 697 F.3d 436, held that a *facially discriminatory* law granting military personnel additional voting days was unlikely to survive constitutional scrutiny.

that a state's minimally burdensome law is unconstitutional). Here, the interests advanced by the State are analogous to, and even better substantiated than those accepted as sufficient in *Crawford*. It follows that the State's present interests pass muster under *Anderson-Burdick*: they justify the minimal burden potentially visited on some African-American voters as a result of S.B. 238. However, even if we were to accept the district court's characterization of the burden as "modest," which may conceivably trigger a slightly less deferential review under the "flexible" *Anderson-Burdick* framework, Ohio's proffered interests are still "sufficiently weighty" to justify it.

Ohio contends S.B. 238 serves four legitimate interests: "(1) preventing voter fraud; (2) reducing costs; (3) reducing administrative burdens; and (4) increasing voter confidence and preventing voter confusion." R. 117, Opinion at 49, Page ID 6171. The district court rejected Ohio's justifications, noting that "while they may be legitimate," the State's "insufficient evidence" shows they are "minimal, unsupported, or not accomplished by S.B. 238." *Id.* at 56, Page ID 6178. The district court demanded too much. For regulations that are not unduly burdensome, the *Anderson-Burdick* analysis never requires a state to actually *prove* "the sufficiency of the 'evidence.'" *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986) (explaining that a contrary rule would "would invariably lead to endless court battles over the sufficiency of the 'evidence'"). Rather, at least with respect to a minimally burdensome regulation triggering rational-basis review, we accept a justification's sufficiency as a "legislative fact" and defer to the findings of Ohio's legislature so long as its findings are reasonable. *See Frank*, 768 F.3d at 750; *see also Munro*, 479 U.S. at 195–96.

*Voter Fraud and Public Confidence*. Ohio first justifies S.B. 238 by asserting that it decreases the opportunity for voter fraud arising from same-day registration during Golden Week. The district court discounted Ohio's interest in combating potential fraud because, "while the general opinion evidence [showed] that Golden Week increases the opportunity for voter fraud . . . actual instances of voter fraud during Golden Week are extremely rare" and "[t]his very limited evidence of voter fraud is insufficient to justify the modest burden imposed by S.B. 238." R. 117, Opinion at 49, Page ID 6171–72. But we do not "require elaborate, empirical verification of the weightiness of the State's asserted justifications." *Timmons v. Twin Cities*

*Area New Party*, 520 U.S. 351, 364 (1997).  Moreover, such a view is totally irreconcilable with *Crawford*, which upheld an unquestionably *more burdensome* regulation requiring all in-person voters in Indiana to maintain and present "photo identification issued by the government" even where the "record contain[ed] no evidence of any such fraud actually occurring in Indiana at any time in its history."  *Crawford*, 553 U.S. at 194–96 (Stevens, J., op.).  The Court had "no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters," *id.* at 196, and because "the risk of voter fraud [is] real [and] . . . could affect the outcome of a close election," the Court declined to examine Indiana's total lack of evidence that the photo identification law would actually preclude fraud in the way it was designed to.  *Id.* at 195–96.

Here, Ohio offers inconclusive, but concrete evidence of voter fraud during Golden Week's same-day registration period.  Under *Crawford*'s teaching, working to achieve that goal is a "sufficiently weighty" interest to justify the minimal burden experienced by some African-American voters.  *Crawford*, 553 U.S. at 191 (Stevens, J., op.).  Running in tandem with the State's interest in preventing voter fraud is its closely related, but independently significant justification for eliminating same-day registration:  safeguarding public confidence by eliminating "even appearances of fraud."  The *Crawford* court accepted this justification as practically self-evidently true, observing that a state's "electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters."  *Crawford*, 553 U.S. at 197 (Stevens, J., op.).  Unlike the district court, we adhere to *Crawford*'s approach and conclude that the State's purpose of preventing potential fraud and promoting public confidence is in furtherance of legitimate and important regulatory interests.

The district court was not only dissatisfied with Ohio's evidence, but also with Ohio's method of combatting potential fraud.  Part of the State's fraud-based rationale arose from the bipartisan OAEO recommendation that early voting begin only after the close of registration, because overlapping registration and voting periods were deemed to constitute "the greatest time for voter fraud to occur."  R. 103, Ward Tr., Page ID 5329; R. 104, Damschroder Tr., Page ID 5448 (explaining that Golden Week "presented a unique risk for voter fraud where a person could, at one event, at one moment, both register to vote, request an absentee ballot and cast an

absentee ballot and then disappear"). S.B. 238 addressed this concern by eliminating Golden Week's same-day registration. The district court, again relying on our vacated decision in *NAACP*, 768 F.3d at 547, attacked the efficacy of eliminating same-day registration in targeting potential fraud by pointing to a hypothetical voter who could still register to vote 30 days before the election and then return to cast an early in-person ballot on the 29th day before the election—in theory, voting before the board of elections completed its mail verification process. R. 117, Opinion at 51, Page ID 6173.

Yet, our task (especially with respect to minimally burdensome laws) is neither to craft the "best" approach, nor "to impose our own idea of democracy upon the Ohio state legislature." *Libertarian Party*, 462 F.3d at 587; *see also Crawford*, 553 U.S. at 196 (Stevens, J., op.) ("While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear.").[6] Rather, we simply call balls and strikes and apply a generous strike zone when the state articulates legitimate and reasonable justifications for minimally burdensome, non-discriminatory election regulations.[7] Given the weight afforded to State measures targeting potential fraud (even without evidentiary support) in *Crawford*; and given the Court's hesitation to scrutinize the regulation's fraud-fighting effectiveness, we accept Ohio's goal of reducing potential voter fraud as an "important regulatory interest" sufficient to justify the minimal burden identified in this case. *See Ohio Council*, 814 F.3d at 338. Moreover, Ohio offers additional justifications.

*Administrative Burdens*. Asserting that its boards of elections are extremely busy with finalizing ballots, running ballots through voting machines for "logic and accuracy testing," processing the registration wave that arrives near the close of registration, and recruiting and

---

[6] As one Ohio witness asked rhetorically, "if you get a weather forecast that says there's a chance of rain, do you run around and open all your windows so you have a wider open window, or do you close all your windows when there is a chance of rain[?]" R. 103, Ward Tr., Page ID 5329. Ohio's elimination of same-day registration to limit or mitigate potential fraud is a reasonable step, even if it will not erase all possibilities of fraud.

[7] *See e.g.*, Hearing Before the Senate Judiciary Comm. on the Nomination of The Honorable John G. Roberts, U.S.C.J., to be the Chief Justice of the United States, 109th Cong. (Sept. 12, 2005), available at http://www.washingtonpost.com/wp-dyn/content/article/2005/09/13/AR2005091300693 html (statement of John G. Roberts) ("[I]t's my job to call balls and strikes and not to pitch or bat."); *see also Weber v. Shelley*, 347 F.3d 1101, 1107 (9th Cir. 2003) ("[I]t is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems. So long as their choice is reasonable and neutral, it is free from judicial second-guessing.").

training poll workers, Ohio justifies S.B. 238 as reflecting a realization of the need to balance early-voting options with the burdens on boards of elections. Again, the district court rejected the State's justification because the "only evidence in support of that notion [was] that in 2010, the Ohio Association of Election Officials [OAEO] task force, aware of these administrative concerns, recommended that early voting begin twenty-one days before Election Day" and the State failed to prove that the boards would be "unable to manage" the administrative burdens and costs associated with Golden Week. R. 117, Opinion at 55 & n.18, Page ID 6177.

Again, the district court demanded too much. We agree rather with the Supreme Court that legislatures "should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively." *Munro*, 479 U.S. at 195. Requiring that a "[s]tate's political system sustain some level of damage before the legislature could take corrective action" is neither practical, nor constitutionally compelled. *Id.*[8] Again, we note that S.B. 238 is minimally burdensome and facially non-discriminatory, and is therefore not violative of equal protection if it advances "important regulatory interests." *Ohio Council*, 814 F.3d at 338. Ohio's proffered interests of preventing voter fraud, increasing voter confidence by eliminating appearances of voter fraud, and easing administrative burdens on boards of elections are undoubtedly "important regulatory interests," *see Crawford*, 553 U.S. at 194–96 (Stevens, J., op.). The State's interests thus provide ample justification. We hold that plaintiffs have failed to establish their "heavy constitutional burden" of demonstrating that S.B. 238 is unconstitutional. *Ohio Council*, 814 F.3d at 338.

As a final note, the district court failed to consider *Crawford* when evaluating Ohio's interests due to its nearly wholesale reliance on our vacated decision in *NAACP*, which went to great lengths to distinguish *Crawford*'s ready acceptance of voter fraud and voter confidence as sufficient justifications for a regulation that imposed only a "limited burden on voter's rights." *Crawford*, 553 U.S. at 203 (Stevens, J., op.). To the extent it relied on our now-vacated decision,

---

[8]The same is true regarding the district court's outright rejection of Ohio's cost savings arguments. Though saving tens of thousands of dollars may be a "minimal" benefit when compared to the overall election budgets, R. 117, Opinion at 53–54, Page ID 6175–76, we reject the district court's dubious and blanket proposition that "where *more than minimal* burdens on voters are established, the State must demonstrate that such costs would actually be burdensome." *Id.* at 6176 (citing *NAACP*, 768 F.3d at 548) (emphasis added). Fiscal responsibility, even if only incrementally served, is undeniably a legitimate and reasonable legislative purpose.

the district court erred. *NAACP* is a different case, as S.B. 238 at that time still included the Secretary of State's Directive 2014-17 that "eliminate[ed] all evening voting hours for non-presidential elections and [] provid[ed] only one Sunday of [early in-person] voting." *NAACP*, 768 F.3d at 539; *see* R. 127-14, Settlement, PID 6775–77 (removing Directive 2014-17 and establishing an agreed-upon voting schedule). *NAACP* therefore analyzed Ohio's law as one imposing a burden that was "significant although not severe," requiring *more justification* than the "modest" burden the district court identified in this case, an interest we here hold to be minimal. The district court therefore used *NAACP* as an imperfect legend, and applied it to a different map. Its reliance on the vacated *NAACP* decision was not sound. Moreover, the vacated opinion in *NAACP* evinced a certain dissatisfaction with the *Crawford* Court's ruling and a preference for the view of dissenting Justices. To the extent the district court, by relying on *NAACP*, effectively resuscitated reasoning at odds with the holding of *Crawford*, the district court ignored a fundamental of our "hierarchical judicial system," which precludes a lower court from "declar[ing] a statute unconstitutional just because [it] thinks . . . that the dissent was right and the majority wrong." *Frank*, 768 F.3d at 750.

"When evaluating a neutral, nondiscriminatory regulation of voting procedure, '[w]e must keep in mind that [a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.'" *Crawford*, 553 U.S. at 203 (Stevens, J., op.) (quoting *Ayotte v. Planned Parenthood of Northern New Eng.*, 546 U.S. 320, 329 (2006)). Plaintiffs prefer that we adopt a broad rule that any expansion of voting rights must remain on the books forever. Such a rule would have a chilling effect on the democratic process: states would have little incentive to pass bills expanding voting access if, once in place, they could never be modified in a way that might arguably burden some segment of the voting population's right to vote. Accepting the "long recognized . . . role of the States as laboratories for devising solutions to difficult legal problems," *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2673 (2015), we hold that imposing such a one-way ratchet is incompatible with the "flexible" *Anderson-Burdick* framework.

Applying *Anderson-Burdick* to S.B. 238, we hold that the State's justifications easily outweigh and sufficiently justify the minimal burden that some voters may experience.

Accordingly, plaintiffs' equal protection challenge fails and the district court's decision must, in this respect, be reversed.

### III. VOTING RIGHTS ACT

#### A. Section 2

The district court also held that S.B. 238 violates § 2 of the Voting Rights Act, 52 U.S.C. § 10301. As originally passed, the Voting Rights Act ("VRA") was interpreted to prohibit only intentional discrimination. *City of Mobile v. Bolden*, 446 U.S. 55, 60–61 (1980) (plurality op.). However, Congress amended the law in 1982 to add a "results" test, making a showing of intentional discrimination unnecessary. *See Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 363 (6th Cir. 2002). As amended, Section 2(a) prohibits a state from "impos[ing] or "appl[ying]" any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . which *results in* a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" 52 U.S.C. § 10301(a) (emphasis added). The statute explains in Section 2(b) that a voting prerequisite, standard, practice, or procedure is deemed to "result in such a denial or abridgment of the right . . . to vote on account of race or color" if:

> [B]ased on the totality of circumstances, it is shown that **the political processes** leading to nomination or election in the State or political subdivision **are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice**. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301(b) (bold emphasis added). The text therefore retained a prohibition against intentional discrimination under § 10301(a), but added Section 2(b) to cover unequally open political processes. *See Baird v. Consol. City of Indianapolis*, 976 F.2d 357, 359–60 (7th Cir. 1992). As it currently stands, Section 2(b) encompasses two types of claims: a "vote-dilution" claim, which alleges that a districting practice denies minorities an equal opportunity "to elect

representatives of their choice," and a "vote-denial" claim,[9] which alleges the denial of opportunity to "participate in the political process." *See* 52 U.S.C. § 10301(a)–(b).

The majority of cases interpreting Section 2 arose in the vote-dilution context, epitomized by the Supreme Court's decision in *Thornburg v. Gingles*, 478 U.S. 30, 47–52 (1986) (establishing a framework for evaluating claims that a jurisdiction's use of an at-large or multi-member electoral system or redistricting plan diluted minority votes, thereby diminishing the ability of minority groups to elect representatives of their choice). While vote-dilution jurisprudence is well-developed, numerous courts and commentators have noted that applying Section 2's "results test" to vote-denial claims is challenging, and a clear standard for its application has not been conclusively established. *See Veasey v. Abbott*, --- F.3d ---, 2016 WL 3923868 at *17 (5th Cir. July 20, 2016) (en banc) ("[T]here is little authority on the proper test to determine whether the right to vote has been *denied* or *abridged* on account of race); *see also Simmons v. Galvin*, 575 F.3d 24, 42 n.24 (1st Cir. 2009) ("While *Gingles* and its progeny have generated a well-established standard for vote dilution, a satisfactory test for vote denial cases under Section 2 has yet to emerge . . . . [and] the Supreme Court's seminal opinion in *Gingles* . . . is of little use in vote denial cases." (internal quotation marks omitted)); *NAACP*, 768 F.3d at 554 ("A clear test for Section 2 vote denial claims . . . has yet to emerge."); Daniel P. Tokaji, *The New Vote Denial: Where Election Reform Meets the Voting Rights Act*, 57 S.C. L. Rev. 689, 709 (2006) (same).

The district court evaluated plaintiffs' vote-denial claim by relying on a framework first articulated in our now-vacated NAACP decision. In that case, the panel viewed the "text of Section 2 and the limited relevant case law as requiring proof of two elements to make out a vote denial claim":

> First . . . the challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice; [and]

---

[9]Vote-denial claims are sometimes referred to as "vote-abridgment" claims. *See Veasey v. Abbott*, --- F.3d ---, 2016 WL 3923868 at *63 (5th Cir. July 20, 2016) (en banc) (Jones, J., dissenting).

> Second . . . that burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.

*NAACP*, 768 F.3d at 554 (internal citations and quotation marks omitted). This framework is helpful in evaluating Section 2 vote-denial claims, but warrants clarification.[10]

The first step essentially reiterates Section 2's textual requirement that a voting standard or practice, to be actionable, must result in an adverse disparate impact on protected class members' opportunity to participate in the political process. But this formulation cannot be construed as suggesting that the existence of a disparate impact, in and of itself, is sufficient to establish the sort of injury that is cognizable and remediable under Section 2. *See* 52 U.S.C. § 10301 (a)–(b). We know this is true because "a showing of disproportionate racial impact alone does not establish a per se violation" of Section 2. *Wesley v. Collins*, 791 F.2d 1255, 1260 (6th Cir. 1986); *see also Gonzalez v. Arizona*, 677 F.3d 383, 405 (9th Cir. 2012) (en banc) ("[A] § 2 challenge based purely on a showing of some relevant statistical disparity between minorities and whites, without any evidence that the challenged voting qualification causes that disparity, will be rejected." (internal quotation marks and citation omitted)); *Frank*, 768 F.3d at 753 (Section 2 "does not condemn a voting practice just because it has a disparate effect on minorities. (If things were that simple, there wouldn't have been a need for *Gingles* to list nine non-exclusive factors in vote-dilution cases.)"). Accordingly, proof of a disparate impact— amounting to denial or abridgement of protected class members' right to vote—that *results from the challenged standard or practice* is necessary to satisfy the first element of the test, but is not sufficient to establish a valid Section 2 vote-denial-or-abridgement claim. We therefore emphasize that the first element of the Section 2 claim requires proof that the challenged standard or practice causally contributes to the alleged discriminatory impact by affording protected group members less opportunity to participate in the political process.

If this first element is met, the second step comes into play, triggering consideration of the "totality of circumstances," potentially informed by the "Senate Factors" discussed in

---

[10]The Fourth and Fifth Circuits have used this framework to evaluate Section 2 claims, but the Seventh Circuit has declined to adopt it. *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014); *Veasey*, 2016 WL 3923868 at *17; *but see Frank*, 768 F.3d at 754 (expressing skepticism about the causal requirement in the second step).

*Gingles*.[11]  This inquiry, as the *Gingles* Court explained, is designed to restore the "results test," whereby a challenged law or structure—albeit not designed or maintained for a discriminatory purpose—can be deemed to deny or abridge the right to vote if *the law or structure* has the effect, as *it* interacts with social and historical conditions, of causing racial inequality in the opportunity to vote.  *Gingles*, 478 U.S. at 43–47.  In other words, a facially neutral, nondiscriminatory standard or practice that results in a disparate impact, but would not otherwise be actionable as an impermissible denial or abridgment of the right to vote, *becomes* actionable as an impermissible denial or abridgment pursuant to Section 2(b) where, in response to the step two inquiry, a disparate impact in the opportunity to vote is shown to result not only from operation of the law, but from the interaction of the law *and* social and historical conditions that have produced discrimination.

As formulated in *NAACP*, the second step asks whether the alleged disparate impact is "in part caused by or linked to 'social and historical conditions' that have or currently produce discrimination against members of the protected class."  *NAACP*, 768 F.3d at 554.  Read in isolation, this formulation of the second step could be erroneously understood to mean that an alleged disparate impact that is linked to social and historical conditions makes out a Section 2 violation.  But if the second step is divorced from the first step requirement of causal contribution by the challenged standard or practice itself, it is incompatible with the text of Section 2 and incongruous with Supreme Court precedent.  Thus, the second step asks not just whether social and historical conditions "result in" a disparate impact, but whether the challenged *voting standard or practice* causes the discriminatory impact as *it* interacts with social and historical conditions.  *See* 52 U.S.C. § 10301(a)–(b) (providing that, to be actionable, a voting standard or practice must "result in" (i.e., *cause*) a discriminatory impact on the opportunity of protected class members to "participate in the political process"); *see also Gingles*, 478 U.S. at 47; *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 867 (5th Cir. 1993) ("[S]ocioeconomic disparities and a history of discrimination, without more" are insufficient to establish Section 2's causal nexus).

---

[11]The *Gingles* "Senate Factors" derive from a Senate Report related to the 1982 amendments to the Voting Rights Act and are sometimes used as a non-statistical proxy in vote-dilution cases to link disparate impacts to current or historical conditions of discrimination.  *See Gingles*, 478 U.S. 30, 43–45.

The foregoing construction of Section 2 is not only faithful to the statutory text and legislative history referred to in *Gingles*, but also makes practical sense.  Conversely, to apply Section 2 to invalidate a State's innocuous voting regulation based solely on evidence that social and historical conditions resulted in a disparate impact would impermissibly punish a state for the effects of private discrimination.  *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2523 (2015) (explaining that that state entities should not be "held liable for racial disparities they did not create"); *see also Milliken v. Bradley*, 418 U.S. 717 (1974).  We therefore clarify that S.B. 238 is actionable as a Section 2 violation only if it is shown to causally contribute, as it interacts with social and historical conditions that have produced discrimination, to a disparate impact on African Americans' opportunity to participate in the political process.  *See* 52 U.S.C. § 10301(a)–(b).

## B.  Disparate Impact

The district court paid little attention to the disparate impact element of the first step, referring simply to its prior *Anderson-Burdick* analysis to conclude that S.B. 238 "imposes a burden on the rights of African Americans to vote" and assuming that conclusion was sufficient to establish that S.B. 238 disparately impacted African Americans in a manner cognizable under Section 2.  R. 117, Opinion at 98, Page ID 6220.  But this hasty conclusion neglected the first step of our inquiry:  whether S.B. 238 actually disparately impacts African Americans by resulting in "less opportunity [for African Americans] than other members of the electorate to participate in the political process."  52 U.S.C. § 10301(b).

In fact, when compared to other members of the electorate, the statistical evidence in the record clearly establishes that Ohio's political processes are equally open to African Americans.  In 2008, 2010, 2012, and 2014, African Americans registered at higher percentages than whites, and both groups' registration numbers are statistically indistinguishable in every federal election since 2006.  R. 127-18, Hood Rebuttal, Page ID 7366–67 (noting that African-American voter turnout "either exceeds or is the same as white turnout in Ohio").  Moreover, plaintiffs do not dispute the evidence that all voters who used Golden Week in 2010, regardless of race, were just as likely to vote in 2014 without Golden Week.  R. 98, McCarty Tr., Page ID 4141–42

(explaining that "those people who voted on an eliminated day were no less likely to vote in 2014 than someone who had voted on a preserved day").

This statistical evidence takes on even greater significance when we consider that the 2014 data reflects registration and voting *after* S.B. 238 was implemented, but *before* the *NAACP* settlement added an additional Sunday of voting and additional night and weekend hours. That is, the statistical evidence shows that African Americans' participation was at least equal to that of white voters in 2014 under a version of S.B. 238 that afforded even less convenience than the current version. The statistical evidence thus runs directly contrary to the district court's speculative conclusion that the current S.B. 238 would have a disparate adverse impact on African Americans' participation.[12] Instead, the statistical evidence rather clearly shows that S.B. 238 did not result in any cognizable, racially disparate impact such that African Americans were afforded "less opportunity than other members of the electorate to participate in the political process." 52 U.S.C. § 10301(b). Plaintiffs offer no contrary statistical evidence showing a disparate impact, but merely argue that the relevant expert report contains a large margin of error for black registration rates, rendering "the probative value of this evidence limited." Appellee Br. at 29. Though we acknowledge the argument, plaintiffs' otherwise unsubstantiated criticism of the reliability of the record evidence is insufficient to meet their burden of establishing that S.B. 238 results in a racially disparate impact actionable as a violation of Section 2. *See Frank*, 768 F.3d at 754.

We therefore hold that plaintiffs have failed to meet the first step in establishing a vote denial or abridgement claim under Section 2 of the Voting Rights Act. They have failed to establish a cognizable disparate impact. Consequently, the second step inquiry regarding the causal interaction of S.B. 238 with social and historical conditions that have produced discrimination is immaterial. Plaintiffs have failed to establish a violation of Section 2 of the Voting Rights Act. The district court's contrary conclusion is in error and must be reversed.

---

[12]The statistical evidence not only exposes the error in the district court's uncritical borrowing of its "burden" conclusion from its analysis of the equal protection claim, but also further substantiates our assessment that the burden is properly characterized as, at most, "minimal," not "modest."

## IV. CONCLUSION

Accordingly, we conclude that S.B. 238, affording abundant and convenient opportunities for all Ohioans to exercise their right to vote, is well within the constitutionally granted prerogative and authority of the Ohio Legislature to regulate state election processes. It does not run afoul of the Equal Protection Clause or the Voting Rights Act, as those laws have been interpreted and applied to voting regulations in the most instructive decisions of the Supreme Court. The district court's award of declaratory and injunctive relief invalidating and enjoining enforcement of S.B. 238 must be **VACATED** and its judgment must be, to this extent, **REVERSED**.

---------------

**DISSENT**

---------------

STRANCH, Circuit Judge, dissenting.  The majority opinion today overturns a decision in which the district court conducted a 10-day bench trial considering the testimony of more than 20 witnesses, including at least 8 experts.  It ultimately penned 120 pages dismissing all of Plaintiffs' challenges to S.B. 238 except its elimination of Golden Week (reducing early in-person (EIP) voting and eliminating same day registration (SDR)), which it enjoined.  In reversing this decision, the majority opinion employed an incorrect standard of review and created and applied new tests, unadorned by precedent, instead of those that we and our sister Circuits have found applicable to voter denial cases such as this one.  I therefore respectfully dissent.

Before addressing the governing law in light of the extensive record before us, I need to address the assumptions that frame the majority's opinion.  This case is portrayed as an improper intrusion of the federal courts "as overseers and micromanagers, in the minutiae of state election processes." (Maj.Op. at 2)  I disagree.  In *Veasey v. Abbott,* --- F.3d ---, 2016 WL 3923868, at *44 (5th Cir. July 20, 2016) (en banc) (Higginson, J., concurring), the Fifth Circuit provides a fitting answer to this charge.  It explains why it is healthy to scrutinize the river of State voting regulations that has flowed in the wake of *Shelby County v. Holder,* 133 S. Ct. 2612 (2013): "Such scrutiny should be seen not as heavy-handed judicial rejection of legislative priorities, but as part of a process of harmonizing those priorities with the fundamental right to vote—a topic with which over a quarter of our Constitution's amendments have dealt in one way or another, and an individual right that cannot be compromised because an adverse impact falls on relatively few rather than many."

This explanation grows from advances in both our social and legal systems.  Take the example of states that required literacy tests to vote, a practice our Supreme Court refused to challenge the "wisdom" of in the 1950s, on the basis that, "Literacy and intelligence are obviously not synonymous. Illiterate people may be intelligent voters. Yet in our society where newspapers, periodicals, books, and other printed matter canvass and debate campaign issues, a

State might conclude that only those who are literate should exercise the franchise." *Lassiter v. Northampton Cty. Bd. of Elections,* 360 U.S. 45, 50–53 (1959). By the 1960s, the Court recognized that "[w]hen a State exercises power wholly with in the domain of State interest, it is insulated from Federal judicial review. But such insulation is not carried over when State power is used as an instrument for circumventing a federally protected right." *Gomillion v. Lightfoot*, 364 U.S. 339, 347 (1960). In 1965, the men and women the American people elected to Congress passed the Voting Rights Act (VRA) expressly providing for oversight of state voting regulations and outlawing literacy tests. Testimony by Attorney General Nicholas Katzenbach during the passage of the Act explained why:

> Whether there is really a valid basis for the use of literacy tests is . . . subject to legitimate question. But it is not for this reason that the proposed legislation seeks to abolish them in certain places. Rather, we seek to abolish these tests because they have been used in those places as a device to discriminate against Negroes. . .
>
> Our concern today is to enlarge representative government. It is to solicit the consent of all the governed. It is to increase the number of citizens who can vote. What kind of consummate irony would it be for us to act on that concern—and in so doing reduce the ballot, to diminish democracy? It would not only be ironic; it would be intolerable.

*Voting Rights: Hearings on H.R. 6400 Before the H. Comm. on the Judiciary*, 89th Cong. 16–17 (1965) (statement of Nicholas deB. Katzenbach, Attorney General of the United States).

Our social and legal advances as a society are reflected in the Supreme Court's decisions during the 1960s that accepted a searching review and scrutiny of voting regulation as necessary. "The Voting Rights Act was aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race." *Allen v. State Bd. of Elections*, 393 U.S. 544, 565 (1969). Following the 1982 amendments to the VRA, the Court explained both the fullness of the review required and the reason why such scrutiny is essential:

> The need for such "totality" review springs from the demonstrated ingenuity of state and local governments in hobbling minority voting power, *McCain v. Lybrand,* 465 U.S. 236, 243–246, (1984), a point recognized by Congress when it amended the statute in 1982: "[S]ince the adoption of the Voting Rights Act, [some] jurisdictions have substantially moved from direct, over[t] impediments to the right to vote to more sophisticated devices that dilute minority voting strength," Senate Report 10 (discussing § 5). In modifying § 2, Congress thus

> endorsed our view in *White v. Regester,* 412 U.S. 755 (1973), that "whether the political processes are 'equally open' depends upon a searching practical evaluation of the 'past and present reality,'" Senate Report 30 (quoting 412 U.S., at 766, 770).

*Johnson v. De Grandy,* 512 U.S. 997, 1018 (1994).

As numerous cases recognize, those who seek to discriminate against a segment of the population do not trumpet their intentions—or do not do so publicly. The 2006 amendments to the VRA identified our progress as well as this continuing problem, noting that "vestiges of discrimination in voting continue to exist as demonstrated by second generation barriers constructed to prevent minority voters from fully participating in the electoral process." H.R. Rep. No. 109-478, at 2 (2006), *as reprinted in* 2006 U.S.C.C.A.N. 618.

While our case law has struggled to articulate how judges can practically and should appropriately review state laws governing the fundamental right to vote, we have steadily progressed beyond a standard that refused to review the wisdom of a State's choice to employ procedures, such as literacy tests, that function to disenfranchise selected voters. I do not think that it is federal intrusion or micromanaging to evaluate election procedures to determine if discrimination lurks in an obvious rule or in a subtle detail. Our recent jurisprudence does not shy away from the scrutiny that is essential to protection of the fundamental right to vote, though it recognizes the difficulty of the task. "Rather than applying any 'litmus test' that would neatly separate valid from invalid restrictions, we concluded that a court must identify and evaluate the interests put forward by the State as justifications for the burden imposed by its rule, and then make the 'hard judgment' that our adversary system demands." *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 190 (2008). I turn to the case before us to explain why my view of the hard judgment here differs from that of my colleagues.

## I. DISTRICT COURT RECORD AND DECISION

I begin with the extensive record made in the district court. The court evaluated evidence provided by both expert and lay witnesses over a ten day trial and found that the "reduction in overall time to vote w[ould] burden the right to vote of African Americans, who use EIP voting significantly more than other voters" (R. 117, PageID 6161), "specifically during Golden Week."

(*id.* at 6160)  It ultimately held that S.B. 238's "elimination of Golden Week imposes a modest burden—which the Court defines as a more than minimal but less than significant burden—on the right to vote of African Americans."  (R. 117, PageID 6156–57)  For example, an expert analysis of individual level data based on census blocks within three of the largest counties in Ohio—which contain nearly two-fifths of the state's minority population—found that "the rate which African Americans used EIP voting in 2010 and 2014 was slightly higher than the white rate," (*id.* at 6159) and that the "usage rates of *Golden week specifically* were far higher among African Americans than among whites in both 2008 and 2012." (*Id.*)  The Golden Week usage rates in 2008 for 100% homogeneous black census blocks was 3.514 times higher than 100% white blocks. (*Id.*)  In 2012, the Golden Week usage rate was 5.186 times higher for homogeneous black blocks. (*Id.*)  The district court also noted the expert evidence that African Americans are "more likely to be subject to economic, transportation, time, and childcare constraints that increase the cost of voting." (*Id.* at 6162)  "[R]elative to whites," the district court found, "African Americans in Ohio are less likely to work in professional and managerial jobs; are more likely to work in service and sales jobs, including hourly wage jobs; have lower incomes; are nearly three times more likely to live in poverty; and are more than two and a half times more likely to live in a neighborhood in which more than 20% of the residents are in poverty." (*Id.*)

> The court's review of the record evidence evincing these disparities led it to conclude
>
> that the cost of voting is therefore generally higher for African Americans, as they are less likely to be able to take time off of work, find childcare, and secure reliable transportation to the polls.  Moreover, greater levels of transience may result in more frequent changes of address, which in turn requires individuals to update their registration more frequently.  SDR [same-day registration] provided an opportunity to do so and vote at the same time.  As such, African Americans disproportionately make up the group that benefits the most from SDR, and the elimination of that opportunity burdens their right to vote.

(*Id.* at PageID 6163–64)  The district court relied on this evidence and numerous other expert reports and testimony from lay witnesses that it found credible to support its conclusions that the reduction in EIP voting time, and the elimination of Golden Week specifically, imposes a modest burden on the right to vote of African Americans citizens of Ohio.

A great deal of work underlies the district court's conclusion on this important subject. Both that work and the substantial support found in the record stand in opposition to the majority opinion's blithe assertion "that it's easy to vote in Ohio. Very easy, actually." (Maj.Op. at 10) This assertion is problematic for another reason—the district court's finding that Ohio law imposes some burden on the right of African Americans to vote in Ohio indicates that how "easy" it is to vote under Ohio's new regime bears some small but definable relationship to the color of your skin. This burden is the fact-bound conclusion that we address on appeal.

I begin my analysis of the appropriate tests and application to the facts from the record with the equal protection claim.

## II.  EQUAL PROTECTION

This analysis must start with the correct standard of review. The majority argues that de novo review applies to the district court's conclusion that elimination of Golden Week imposes a "modest" burden on the right of African American's to vote. (Maj. Op. at 10) Neither our precedent nor that of our sister Circuits supports this argument.

In *Obama for America v. Husted*, 697 F.3d 423, 431 (6th Cir. 2012) (*OFA*), we applied clear error review to a district court's determination that an Ohio law restricting early in-person voting placed a "burden on Plaintiffs [that] was 'particularly high' because their members, supporters, and constituents represent a large percentage of those who participated in early voting in past elections." We held that "[b]ased on the evidence in the record, this conclusion was not clearly erroneous." *Id.* *OFA* involved an appeal from a district court's grant of a preliminary injunction and, accordingly, we reviewed the court's legal conclusions de novo and its factual determinations for clear error. *See id.* at 428. The same standard applies where, as here, a party appeals following a bench trial. *See Pressman v. Franklin Nat'l Bank*, 384 F.3d 182, 185 (6th Cir. 2004). Consequently, it is clear error review we must apply to the district court's finding that the elimination of Golden Week imposes a more than minimal but less than significant burden on African Americans' right to vote in Ohio. *See OFA*, 697 F.3d at 431; *see also Ohio State Conference of the NAACP v. Husted*, 768 F.3d 524, 532–37 (6th Cir. 2014) [hereinafter "*NAACP*"] (reviewing for clear error district court's determination that reductions in

early voting would disproportionately and negatively impact African Americans), *vacated on other grounds by* No. 14-3877, 2014 WL 10384647, at *1 (6th Cir. Oct. 1, 2014).

The majority opinion cites four cases to support its proposed substitution of de novo review. None of those cases governs here. The first, *Bright v. Gallia County*, 753 F.3d 639, 652 (6th Cir. 2014), was an appeal from a district court's dismissal of a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), which is a procedural posture that calls for de novo appellate review. *Bright* was not a voting case, or even an election law case, and its procedural posture makes its standard inapplicable here. Thus, it does not stand for the proposition that the district court's post-trial, fact-bound finding regarding the burden S.B. 238 places on African Americans' right to vote is subject to de novo review. The remaining three cases, *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (en banc); *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 583 (6th Cir. 2006), and *Green Party of Tennessee v. Hargett*, 767 F.3d 533, 542 (6th Cir. 2014), are similarly inapposite. These cases were appeals from summary judgment orders rendering them subject to de novo appellate review. *Libertarian Party* and *Green Party*, moreover, concerned associational rights—specifically, ballot access—not the right to vote. *See Libertarian Party*, 462 F.3d at 585 ("[W]e are cognizant that 'the state laws place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.'" (quoting *Williams v. Rhodes*, 393 U.S. 23, 30 (1968)); *Green Party*, 767 F.3d at 545 (recognizing that while "[a]ssociational rights and voting rights are closely connected . . . [s]till, states may impose reasonable restrictions on ballot access"). *Libertarian Party* firmly grounded its burden analysis in the associational rights context, explaining that "[t]he key factor in determining the level of scrutiny to apply is the importance of the associational right burdened[,]" 462 F.3d at 587, and *Green Party* in turn relied on that analysis, *see* 767 F.3d at 547 (citing *id.*).

None of the cases cited by the majority dictates our standard of review here. Rather, as in *OFA* (and *NAACP*), we are limited to reviewing for clear error the district court's finding based on record evidence that S.B. 238's "elimination of Golden Week imposes a modest burden—which the Court defines as a more than minimal but less than significant burden—on the right to

vote of African Americans." (R. 117, PageID 6156–57). Our sister Circuits agree. The Fourth and Fifth Circuits have applied clear error review to the findings made by district courts in similar challenges under the Fourteenth Amendment and Section 2 of the Voting Rights Act.[1] *See N.C. State Conference of NAACP v. McCrory*, --- F.3d ---, 2016 WL 4053033, at *6 (4th Cir. July 29, 2016) (applying clear error review to the "ultimate factual question" of a legislature's discriminatory motivation); *Veasey v. Abbott*, 2016 WL 3923868, at *5 (applying clear error review to district court's finding that a Texas voter ID law violated the Fourteenth Amendment and Section 2 of the Voting Rights Act). "In reviewing the district court's findings for clear error, we may not substitute our judgment for that of the district court and 'must uphold the [district] court's account of the evidence if it 'is plausible in light of the record viewed in its entirety.'" *Lee v. Wiley*, 789 F.3d 673, 680 (6th Cir. 2015) (alteration in original) (quoting *Pledger v. United States*, 236 F.3d 315, 320 (6th Cir. 2000)).

Applying the correct standard reveals that the district court's finding of a modest burden under the *Anderson-Burdick* test is more than plausible—it is well-supported by the record. (*See* R. 117, PageID 6153–70) The district court extensively reviewed and relied upon expert and anecdotal evidence in the record before concluding that "this evidence of the effects of the reduction in EIP voting days and the elimination of SDR demonstrates that S.B. 238 imposes a modest, as well as a disproportionate, burden on African Americans' right to vote." (*Id.* at PageID 6164; *see also id.* at 6156–57)

In arguing under the standard it proposes, the majority seeks to rely on voting systems in other states as an important "contextual basis" (Maj.Op. at 12) for determining whether the burden of S.B. 238 falls disproportionately on African Americans. But the usefulness of that contextual information depends on whether the many variable methods for voting in each system line up. Certain types of voting processes, like early voting, "do[] not necessarily play the same role in all jurisdictions in ensuring that certain groups of voters are actually able to vote" and as a result, "the same law may impose a significant burden in one state and only a minimal burden in the other." *NAACP*, 768 F.3d at 546. Simply stating that Ohio's early voting system is "one of

---

[1]In addressing a claim similar to our own, the Seventh Circuit was not specific about the standard of review, instead faulting the district court for failing to make adequate findings then resolving the case as indistinguishable from *Crawford* and thus controlled by it. *See Frank v. Walker*, 768 F.3d 744, 751 (7th Cir. 2014).

the more generous in the nation" (Maj.Op. at 11) provides little helpful information. It fails, for example, to account for the rate at which early voting is actually used by different populations, let alone how the voting options in other states might impact the comparison. In most respects, this issue is local and dependent on the particular circumstances of Ohio's law and its population. Analysis of the burden that S.B. 238 places on Ohio voters thus necessarily entails engaging with the factual record. The majority opinion fails to perform that essential work.

The majority opinion next seeks to recast African American voters' reliance on EIP and SDR as mere "personal preference." (Maj.Op. at 13) This is based on surmise, not record evidence. So, too, is its conclusory assertion that "[a]t worst," the elimination of Golden Week "represents a withdrawal or contraction of just one of many conveniences that have generously facilitated voting participation in Ohio." (*Id.* at 10) The record in this case shows that the State of Ohio instituted no fault early voting in 2005 not as a generous convenience but as a necessary tool "to remedy the manifold problems experienced during the 2004 election," (R. 117, PageID 6156) "including extremely long lines at the polls" and other "election administration problems." (*Id.* at 6144) As the Fourth Circuit recently concluded in a similar vote denial case and as this record supports, "socioeconomic disparities establish that no mere 'preference' led African Americans to disproportionately use early voting[ and] same-day registration[.]" *McCrory*, 2016 WL 4053033, at *17. "Registration and voting tools may be a simple 'preference' for many white [voters]," the Fourth Circuit recognized, "but for many African Americans they are a necessity." *Id.*

The majority opinion again relies on assumptions about voting preferences to conclude that the record evidence that African Americans use early voting at higher rates than other voters may make them "theoretically disadvantaged" (Maj.Op. at 14) by reductions in early voting. There is nothing theoretical about the disadvantage found by the district court. Using an extensive record, the district court determined that S.B. 238's changes to early voting and same day voter registration impose a modest and disproportionate burden on African Americans' right to vote. The majority points to no clear error by the district court on the record. I would affirm its finding because it satisfies the correct standard of review.

The majority opinion, however, rejects the district court's decision that S.B. 238 imposes a "modest" burden and, based on its chosen standard of de novo review, concludes that it is a "minimal burden." (Maj.Op. at 10–13) Building on that error, it applies a deferential standard of review akin to rational basis and presumes that *Crawford* both applies and resolves this case. (Maj.Op. at 14–15)

This series of conclusions relies on standards of review not applicable to this case. First, *Crawford* arose in a different context because it was an appeal from a summary judgment order, not a bench trial. Second, the case is factually distinct in essential ways because there the Court "held only that the lower courts 'correctly concluded that the evidence in the record [was] not sufficient to support a facial attack on the validity of the entire statute' under the constitutional *Anderson-Burdick* framework." *Veasey v. Abbott*, 2016 WL 3923868, at *41 (Higginson, J., concurring) (alterations in original) (quoting *Crawford*, 553 U.S. at 189). *Crawford* concerned a facial challenge to a voter identification law, but the summary judgment record in that case "(1) did not quantify the voters without qualifying ID, (2) provided no 'concrete evidence of the burden imposed on voters who currently lack photo identification,' and (3) said 'virtually nothing about the difficulties faced by . . . indigent voters.'" *Id.* (alteration in original) (quoting *Crawford*, 553 U.S. at 200–01). In other words, "[t]he petitioners in *Crawford* had not presented any evidence in the record that even estimated the number of individuals who lacked identification cards. Nor did the affidavits or depositions in the record of lower-income individuals or elderly voters in *Crawford* substantiate that they in fact faced difficulties in obtaining identification cards." *NAACP*, 768 F.3d at 544 (citation omitted). Thus, "on the basis of the record that ha[d] been made in th[at] litigation," the Court could not "conclude that the statute impose[d] excessively burdensome requirements." *Crawford*, 553 U.S. at 202.

Here, by contrast, the record is replete with specific evidence supporting the plaintiffs' claims and the district court's conclusion regarding the amount of burden imposed by the elimination of Golden Week. (*See* R. 117, PageID 6153–70) Over the course of a ten day bench trial, the district court weighed evidence from eight expert witnesses and nineteen lay witnesses, from statistical analyses to testimony of Get Out the Vote efforts, ultimately making determinations of credibility that led to its conclusion that S.B. 238 disproportionately burdens

African Americans.  (*See id.* at 6128–44)  The record in this case provides ample evidence by which the district court could "quantify . . . the magnitude of the burden" on African American voters.  *Crawford*, 553 U.S. at 200.  I would also affirm the district court's application of *Anderson-Burdick* balancing and the court's resulting conclusion that the State has failed to present sufficient evidence to show that its specific (as opposed to abstract) interests justify the burden that eliminating Golden Week imposes on African American voters.  (*See* R. 117, PageID 6170–79)

The majority opinion argues that the overarching question with respect to plaintiffs' equal protection claim in this case is whether Ohio may experiment with expanding and contracting voting regulations.  Of course it may.  The question is whether it may do so in a way that disparately impacts a protected group without sufficient justification by a relevant and legitimate state interest.  Because I agree with the district court that Ohio's revised S.B. 238 improperly burdens the right to vote of African American citizens of Ohio and constitutes a violation of equal protection, I respectfully dissent.

### III.  THE VOTING RIGHTS ACT

The majority acknowledges the test for vote denial claims under Section 2 of the VRA that we laid out two years ago in *NAACP* but suggests that it warrants clarification.  (Maj.Op. at 22–23)  This clarification, however, leads it to apply an inappropriately strict threshold for Section 2 claims.  I would remain faithful to our original *NAACP* framework, as adopted and applied by the Fourth and Fifth Circuits, and as correctly applied by the district court.

*NAACP* concerned a plaintiff's request for a preliminary injunction in advance of the 2014 election, and was vacated as moot following that election.  *See Ohio State Conference of the NAACP v. Husted*, No. 14-3877, 2014 WL 10384647, at *1 (6th Cir. Oct. 1, 2014).  Nonetheless, it remains persuasive authority, that has been subsequently adopted by another panel of this court.  *See Mich. State A. Philip Randolph Inst. v. Johnson*, --- F.3d ---, 2016 WL 4376429, at *7 n.2 (6th Cir. Aug. 17, 2016).  Drawing on the text of Section 2 itself and the guidance in *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986), *NAACP* laid out a two-part framework for assessing vote-denial claims: first, "the challenged standard, practice, or

procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice," and second, "that the burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class." *NAACP*, 768 F.3d at 544 (quotation marks omitted). In *NAACP,* this court also explicitly found the nine factors laid out in *Gingles* to be relevant to the second part of this analysis and encouraged their consideration. *Id.*

Both the Fifth Circuit sitting en banc and the Fourth Circuit have adopted and applied our *NAACP* test in full. *See Veasey*, 2016 WL 3923868, at *17 ("We now adopt the two part framework employed by the Fourth and Sixth Circuits to evaluate Section 2 'results' claims."); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 240–41 (4th Cir. 2014) (adopting Sixth Circuit test for Section 2 vote-denial claims). These courts acknowledged that Section 2 jurisprudence had primarily developed in the vote-dilution context and a clear standard for vote-denial claims had not previously been settled. Then both explicitly adopted *NAACP*'s two-part framework and incorporated the *Gingles* factors. *See Veasey*, 2016 WL 3923868, at *18 ("As did the Fourth and Sixth Circuits, we conclude that the *Gingles* factors should be used to help determine whether there is a sufficient causal link between the disparate burden imposed and social and historical conditions produced by discrimination."); *League of Women Voters of N.C.*, 769 F.3d at 240 ("These [*Gingles*] factors may shed light on whether the two elements of a Section 2 claim are met.").

The Ninth and Eleventh Circuits have also expressed approval for considering the *Gingles* factors in the vote-denial context. *See, e.g.*, *Gonzalez v. Arizona*, 677 F.3d 383, 405–06 (9th Cir. 2012) (en banc) (explaining that "courts should consider" the *Gingles* factors in vote-denial cases); *Johnson v. Governor of Fla.*, 405 F.3d 1214, 1227 n.26 (11th Cir. 2005) (recognizing that the *Gingles* factors apply to vote-denial cases); *Smith v. Salt River Project Agric. Improvement & Power Dist.*, 109 F.3d 586, 596 n.8 (9th Cir. 1997) (rejecting the argument that the *Gingles* factors "apply only to 'vote dilution' claims").

The district court acknowledged that the vacated opinion in *NAACP* was not "binding," but that nonetheless, it was "free to find the reasoning therein persuasive" (R. 117, PageID 6152.) I agree. The two-part framework as articulated in *NAACP* is both reasonable and appropriate to use when evaluating a Section 2 vote-denial claim, and the district court did not err in its decision to do so here, or in its application.

The Supreme Court has repeatedly instructed that "[t]he Voting Rights Act was aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race," *Allen v. State Bd. of Elections*, 393 U.S. 544, 565 (1969), and "should be interpreted in a manner that provides 'the broadest possible scope' in combating racial discrimination," *Chisom v. Roemer*, 501 U.S. 380, 403 (1991) (quoting *Allen*, 393 U.S. at 567). "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47.

The Senate Report accompanying the 1982 amendments to the VRA "emphasize[d] repeatedly" that the "'right' question" in a Section 2 analysis is "whether 'as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice.'" *Id.* at 44 (quoting S. Rep. No. 97-417, at 28 (1982) [hereinafter S. Rep.], *as reprinted in* 1982 U.S.C.C.A.N. 177, 206). Answering this question requires a court to "assess the impact of the contested structure or practice on minority electoral opportunities 'on the basis of objective factors.'" *Gingles*, 478 U.S. at 44 (citing S. Rep. at 27, 1982 U.S.C.C.A.N. at 205). *Gingles* noted a set of enumerated factors that will "often be pertinent to certain types of § 2 violations, particularly to vote dilution claims," but neither the Report nor the Court have limited their application to such. *Gingles*, 478 U.S. at 45. I agree with our prior precedent and the Fourth, Fifth, Ninth and Eleventh Circuits that the *Gingles* factors can and "should be used to help determine whether there is a sufficient causal link between the disparate burden imposed and social and historical conditions produced by discrimination." *Veasey*, 2016 WL 3923868, at *19.

Rather than following the Supreme Court's guidance to interpret the VRA with the "broadest possible scope," 501 U.S. at 403, the majority adds to the first part of *NAACP* a narrow

threshold inquiry, thereby allowing it to brush aside the district court's analysis of the *Gingles* factors in the second part of the *NAACP* framework. The majority creates a test that requires as a threshold step "proof that the challenged standard or practice causally contributes to the alleged discriminatory impact." (Maj.Op. at 23) This extra requirement is unnecessary. As the text of Section 2 states, a voting standard or practice may only be invalidated under Section 2 if it results in less opportunity for members of a protected class to participate in the political process than others. *See* 52 U.S.C. § 10301. The existing test is true to this text and contains the necessary causal linkage between an electoral regulation and its interaction with social and historical conditions. The second part of the *NAACP* analysis addresses whether the law interacts with social and historical conditions to cause a disparate burden. *See Veasey*, 2016 WL 3923868, at *17. The *Gingles* factors provide context and guidance for whether the causal link between the disparate burden and the social and historical conditions produced by discrimination is sufficient to show a Section 2 violation. *See id.* at *18. The inquiry is "flexible [and] fact-intensive," and requires an examination of the record evidence. *Gingles*, 478 U.S. at 46. Both parts of the proper framework were mirrored in the district court's application below, and by the Fourth and Fifth Circuits when they adopted our framework. *See Veasey*, 2016 WL 3923868, at *21–*33; *League of Women Voters of N.C.,* 769 F.3d at 241 ("Clearly, an eye toward past practices is part and parcel of the totality of the circumstances.")

In finding that S.B. 238 imposes a disparate burden on African Americans, the district court referred to the evidence used in its Equal Protection Clause analysis showing that the law "results in less opportunity for African Americans to participate in the political process than other voters." (R. 117, PageID 6220) This evidence, based on expert analysis as well as lay witness testimony, showed that African Americans utilize EIP voting in higher rates, face higher costs of voting, and disproportionately make up the group that benefits the most from SDR. (*Id.* at 6158–64) The district court found that together, the reduction of EIP and the elimination of SDR would impose a "modest, as well as a disproportionate, burden on African Americans' right to vote." (*Id.* at 6164)

The majority dismisses this conclusion as "hasty," (Maj.Op. at 25) and once again refuses to accept the factual findings made by the district court. Instead, the majority selects two items

from the record to support its conclusion that the political process in Ohio is "equally open to African Americans," (*id.*) including a reference to a rebuttal report by Defense expert Dr. Hood. In so doing, the majority ignores the credibility determinations made by the district court, particularly regarding the statistical evidence provided by Plaintiffs' expert Dr. Timberlake which strongly suggested higher usage rates of EIP and SDR by African Americans. The district court, as fact finder, weighed the evidence provided by these experts, and others, ultimately determining that Timberlake's conclusions were credible (R. 117, PageID 6132) and affording "little weight" to opinions in Hood's report because of its reliance on statements by declarants selected and questioned by defense counsel who Hood never personally questioned and whose declarations he did not confirm with hard data. (*Id.* at 6138)

The majority says that the statistical evidence "runs directly contrary" (Maj.Op. at 26) to the district court's conclusions, and that such evidence "rather clearly shows" (*id.*) that S.B. 238 does not have a disparate impact on African American participation. The majority does not, however, provide support in the record for what statistical evidence it relies on for these statements, or precisely how they run contrary to the district court's conclusions. While dismissing the district court's conclusion that S.B. 238 would have a disparate impact on African Americans as "speculative," the majority fails to account for the speculation in its own substitution. I would affirm the district court's determination that the record reflects the imposition of a disproportionate burden on African Americans' right to vote.

I would also hold that the district court's analysis of the second step of the Section 2 framework, including its application of the *Gingles* factors, was proper. The court found that the plaintiffs had established factors one, two, three, five, and nine, and that factors five and nine were particularly relevant. (*See* R. 117, PageID 6224–28) Factor five assesses "[t]he extent to which members of the minority group . . . bear the effects of discrimination in areas such as education, employment and health, which hinder their ability to participate effectively in the political process." *Gingles*, 478 U.S. at 45. The district court determined that the plaintiffs had "adduced evidence indicating that African Americans in the state of Ohio bear the effects of discrimination in areas such as employment and education." (R. 117, PageID 6226) In coming to this conclusion, the court weighed evidence indicating that, relative to whites, African

Americans are "less likely to work in professional and managerial jobs, are more likely to work in service and sales jobs, including hourly wage jobs; have lower incomes; are nearly three times more likely to live in poverty" and are more likely to live in neighborhoods where others live in poverty. (R. 117, PageID 6162)  The court found this evidence, based on Timberlake's expert testimony and considered against Hood's report, credible. (*See id.* at 6134, 6163, 6226)

Factor nine assesses the tenuousness of the policies underlying the law. *Gingles*, 478 U.S. at 45.  The district court determined that the "justifications offered in support of the elimination of Golden Week," including preventing voter fraud or confusion, reducing costs and administrative burdens, and increasing voter confidence, "were either not supported by evidence or did not withstand logical scrutiny." (R. 117, PageID 6228)  The State's asserted interests are legitimate, and Ohio is "entitled to make policy choices about when and how it will address various priorities." *Veasey*, 2016 WL 3923868, at *31; *see also Crawford*, 553 U.S. at 191.  But where the district court has credited testimony showing "very limited" or "minimal" evidence to actually connect these justifications with the enacted law, the assertion of even legitimate interests may not automatically win the day. (R. 117, PageID 6172, 6174)  Determining whether the political process is "equally open" to all voters requires a "searching practical evaluation of the past and present reality and . . . a functional view of the political process." *Gingles*, 478 U.S. at 45.  The district court performed such an inquiry.

Based on its findings that S.B. 238 imposes a disproportionate burden on African Americans, and that the law was linked to social and historical conditions of discrimination that diminish the ability of African Americans to participate in the political process, the district court concluded that S.B. 238 has a discriminatory effect in violation of Section 2 of the Voting Rights Act.  I would hold that the district court properly applied our preexisting test for Section 2.

## IV.  CONCLUSION

I would affirm the very limited injunction issued by the district court on the basis that S.B. 238's elimination of Golden Week, reducing early in-person voting and same day registration, is a violation of equal protection and Section 2 of the Voting Rights Act of 1965. The district court applied the correct constitutional and statutory tests and its decision is fully

supported by the extensive record resulting from its ten day bench trial. The charge that this appeal—and apparently many others—intrude upon the right of the states to run their own election process is both unfounded and antiquated. Our American society and legal system now recognize that appropriate scrutiny is essential to protection of the fundamental right to vote. The scrutiny applied by the district court was proper and in accord with governing precedent. I therefore respectfully dissent.